(Nos. 84-CC-3228, 84-CC-3398, 84-CC-3565, 84-CC-3602, 85-CC-0001, 85-CC-0137, 85-CC-0197, 85-CC-0208 & 85-CC-0355 cons.—

The Counties of McLean, Livingston, Tazewell, Kane, Woodford, Stephenson, DeWitt, Lake, and DeKalb, Claimants, *v.* The State of Illinois, Respondent.

*Opinion filed December 23, 1994.*

Ronald C. Dozier, for Claimant McLean County; Ronald Bernardi, for Claimant Livingston County; Bruce W. Black, for Claimant Tazewell County; J. Patrick Jaeger, for Claimant Kane County; G. Patrick Riley, for Claimant Woodford County; Charles R. Hartman, for Claimant Stephenson County; Stephen H. Peters, for Claimant DeWitt County; Fred L. Foreman, for Claimant Lake County; T. Jordan Gallagher, for Claimant DeKalb County.

Roland W. Burris, Attorney General (Suzanne Schmitz, Assistant Attorney General, of counsel), for Respondent.

OPINION

Sommer, C.J.

These nine counties have requested reconsideration of an order[1] in which this Court pro-rated to them the amount of money remaining in the relevant appropriation and denied the balance of their claims for lack of appropriated funds. Because the legal issues in all nine claims are identical, we will select the first such claim, *McLean County v. State* (84-CC-3228), as an example of the factual scenario typical to these claims.

McLean County seeks an award for one hundred two thousand eighty-eight dollars and thirty-two cents ($102,088.32) as reimbursement pursuant to former section 7—5 of the Juvenile Court Act of August 5, 1965, now codified at 705 ILCS 405/6—10 (formerly Ill. Rev. Stat. ch. 37, par. 707—5), for sums which it expended for the care and support of juveniles ordered to be placed in shelter care by the judges of its circuit court.

After the Department of Children and Family Services (hereafter "DCFS") audited McLean County's claim, it determined that the proper dollar amount was slightly less than that sought:

| FISCAL YEAR | | AUDITED AMOUNT |
|---|---|---|
| 1982 | | $ 5,025.39 |
| 1983 | | 44,739.86 |
| 1984 | | 47,149.71 |
| | TOTAL | $96,914.96 |

Nonetheless, DCFS was unable to pay these audited sums because it had expended more than the appropriations made to it by the General Assembly and only had a total of $13,670.69 in funds remaining to apply to McLean County's claim as well as to the aggregate $344,194.72 in similar audited claims made by the eight

---

[1] Entered in *Woodford County v. State*, 85-CC-0001 (Cons.).

other counties.[2] Accordingly, this Court pro rated the total $13,670.09 in available DCFS funds to each of the nine counties. McLean County's share was $2,762.80, slightly less than 3% of its audited total claim.

Thereafter, all nine of the counties asked this Court to reconsider its decision, arguing that some language taken from a 1917 Illinois Supreme Court decision authorized this Court to award the full amount of their claims. The case which the counties cited is *Fergus v. Brady* (1917), 277 Ill. 272, 115 N.E. 393. Because a thorough understanding of the *Fergus* opinion is crucial to its application in these proceedings, we will begin our analysis with a review of the record from the *Fergus* litigation.

I. Background drawn from the supreme court record in *Fergus v. Brady*, No. 11147.

This case originated in Sangamon County Circuit Court (general no. 31721) on July 9, 1915, when the complainant (Fergus), a taxpayer, sought an injunction against the state treasurer (Russel) which was later amended to include the state auditor (Brady) as an additional party defendant.

In pertinent part, Fergus objected to $408,823.87 in so-called "deficiency bills" passed by the 49th General Assembly which made additional appropriations to various state offices for the amounts by which they had

---

[2] The other counties' claims are:

| County | Case No. | DCFS' Audited Amount of Claim |
| --- | --- | --- |
| DeKalb | 85-CC-0355 | $44,064.72 |
| DeWitt | 85-CC-0197 | 3,867.09 |
| Kane | 84-CC-3602 | 90,423.23 |
| Lake | 85-CC-0208 | 37,542.83 |
| Livingston | 84-CC-3398 | 27,625.07 |
| Stephenson | 85-CC-0137 | 21,688.26 |
| Tazewell | 84-CC-3565 | 47,791.95 |
| Woodford | 85-CC-0001 | 71,191.57 |
| | Total | $344,194.72 |

exceeded or otherwise spent above and beyond the funds previously appropriated to them by the 48th General Assembly.[3] There were 14 such deficiency appropriations which were the subject of Fergus' suit:

| Bill | Amount | Page of Sess. Laws 1915 |
| --- | --- | --- |
| S.B. 159 (Canady)—Deficiency, of Pub. Util. Com. | $35,000.00 | 105 |
| S.B. 316 (Barr)—Deficiency, Joliet Pen. | 125,000.00 | 104 |
| S.B. 464 (Curtis)—Deficiency, Live Stock Comm'rs | 3,000.00 | 17 |
| H.B. 79 (Merritt)—Deficiency, Insurance Supt. | 26,000.00 | 79 |
| H.B 102 (Shepard)—Deficiency, Industrial Board | 29,965.00 | 78 |
| H.B. 209 (Bruce)—Deficiency, Auditor of Pub. Accts. | 4,500.00 | 16 |
| H.B. 256 (Smejkal)—Deficiency, Secretary of State | 12,823.12 | 199 |
| H.B. 340 (Igoe)—Deficiency, Auditor of Public Accounts | 20,000.00 | 63 |
| H.B. 528 (Com. on App.)—Deficiency, Comm'rs State Contracts | 85,000.00 | 17 |
| S.B. 495 (Smith)—Deficiency for Vredenburgh, *et al.* | 25,104.25 | 196 |
| H.B. 541 (Gorman)—Deficiency, Chief Insp. Priv. Emp. Ag'cy | 5,000.00 | 43 |
| H.B. 574 (Smejkal)—Deficiency, Leg. Ref. Bureau | 15,000.00 | 70 |
| H.B. 586 (Morris)—Deficiency, Southern Ill. Pen. | 19,056.50 | 103 |
| H.B. 730 (Com. on App.)—Deficiency, Clerk of Supreme Court | 3,375.00 | 43 |

---

[3] Fergus separately objected to other appropriations which were part of an Omnibus Bill. Since the Omnibus Bill was not related to the 14 deficiency appropriations, it will not be examined in this discussion of Fergus' litigation.

Fergus maintained that these deficiency appropriations were unconstitutional for numerous reasons, including: (1) they exceeded the revenue of the State authorized to be raised by taxation during the period ending September 30, 1915; (2) the appropriations attempted to grant additional and extra compensation, fee, and allowance, without express authority of law, and after service had been rendered and after contract had been made; and (3) because the various offices of the State government had exceeded their authority in purchasing supplies and employing personnel and otherwise becoming obligated, the heads of such departments as public officers thereby then and there became personally responsible for the sums, and the deficiency appropriations by the State to pay these bills was an attempt upon the part of the State to assume the now personal debts and liabilities of such public officials.

The trial court rejected Fergus' arguments and held: (1) that the term "revenue" included all revenue from any source; and (2) that the deficiency appropriations were constitutional and legal.[4]

II. Synopsis of the supreme court's opinion in *Fergus v. Brady* as correlated to the trial court record.

The supreme court affirmed the trial court's construction of the term "revenue" and held that deficiency appropriations are constitutionally permissible for State expenditures which were within the direct, definite, and explicit scope of the "particular and specific" mission of the State officer or department involved. (277 Ill. at 278-280, 115 N.E. at 396.) As an example of an expenditure

---

[4] However, the trial court did sustain Fergus' objections to the appropriations made in the Omnibus Bill and enjoined their payment. The appeal to the supreme court was filed by the auditor and treasurer as to those items, and Fergus took a cross-appeal on the 14 deficiency appropriations which the trial court had upheld.

deemed constitutionally worthy of a deficiency appropriation, the supreme court cited in dicta one of the appropriations which the 49th General Assembly had made to the Southern Illinois Penitentiary:

"The authorities in control of the penitentiary are required by law to receive, feed, clothe, and guard prisoners convicted of crime and placed in their care, involving the expenditure of money, which may vary on account of the cost of clothing, food, and labor beyond the control of the authorities, and which could not be accurately estimated in advance for that reason or by determining the exact number of inmates." 277 Ill. at 279; 115 N.E. at 396.

Because the penitentiary dicta was selected by the supreme court as its benchmark for a constitutionally permissible deficiency appropriation and was later looked to by the Court of Claims to develop its own *Fergus* doctrine, some additional scrutiny of that appropriation is warranted. The Southern Illinois Penitentiary's deficiency appropriation amounted to $19,035.50. Of that sum, a total of $13,750.72 had been granted by the auditor and paid by the treasurer prior to the initiation of Fergus' suit, and there remained $3,783.37 in unpaid and outstanding warrants drawn against the deficiency appropriation, detailed in part as follows:

| Warrant No. | On Account of | Amount |
|---|---|---|
| 73038 | Telegrams | $2.85 |
| 77419 | Eyelets, top dressing, repairing dashboard | 4.70 |
| 77431 | Onions, meal, eggs | 54.45 |
| 77442 | Lawn mower repairs | 2.95 |
| 77443 | Wells-Fargo express | 3.52 |
| 77446 | Postage stamps | 97.00 |
| 77457 | Freight | 182.29 |
| 78676 | Warden's salary | 416.66 |
| 78677 | Commissioner's salary | 125.00 |
| 78680 | Chaplain's salary | 125.00 |
| 78681 | Guard | 43.33 |
| 78682 | Guard | 60.67 |
| 78684 | Guard | 75.00 |
| 78686 | Guard | 51.34 |

| 78687 | Guard | 52.00 |
|---|---|---|
| 78689 | Guard | 50.00 |
| 78690 | Guard | 65.00 |
| 78691 | Assistant Deputy Warden | 125.00 |
| 78692 | Guard | 65.34 |
| 78693 | Guard | 33.33 |
| 78695 | Guard | 53.17 |
| 78696 | Guard | 75.00 |
| 78697 | Guard | 60.00 |
| 78698 | Guard | 65.00 |
| 78699 | Pharmacist | 60.00 |
| 78700 | Housekeeper | 50.00 |
| 78702 | Guard | 55.00 |
| 78704 | Stenographer | 67.50 |
| 78705 | Guard | 65.00 |
| 78707 | Guard | 40.00 |
| 78708 | Guard | 60.00 |
| 78710 | Carpenter | 35.00 |
| 78711 | Guard | 48.00 |
| 78712 | Guard | 60.00 |
| 78713 | Carpenter | 58.50 |
| 78715 | Florist | 75.00 |
| 78718 | Deputy Warden | 134.44 |
| 78719 | Guard | 55.00 |
| 78720 | Guard | 55.00 |
| 78721 | Guard | 70.00 |
| 78722 | Guard | 62.84 |
| 78723 | Guard | 35.00 |
| 78724 | Guard | 60.67 |
| 78727 | Guard | 50.00 |
| 78728 | Guard | 50.00 |
| 78729 | Guard | 50.00 |
| 78730 | Bookkeeper | 70.00 |
| 78732 | Cook | 40.00 |
| 78735 | Guard | 55.00 |
| 78736 | Guard | 45.50 |
| 78738 | Guard | 49.83 |
| 78739 | Gardener | 79.34 |
| 78740 | Guard | 75.00 |
| 78741 | Guard | 75.00 |
| 78742 | Steward | 100.00 |

The record does not provide an itemization of the $13,750.72 previously paid, but recites that it was for generally similar expenses:

- "to engage and employ a large number of clerks, assistant wardens, keepers, engineers and other servants"; and

- "to contract with various persons and for numerous articles and supplies and to obtain services from various corporations and individuals, including contracts for office supplies, printing, stenographic services, express and other matters."

Thus, these are the sort of expenditures which the supreme court considered to be within the direct, definite, and explicit scope of the "particular and specific" mission of the Southern Illinois Penitentiary.

III. The *Fergus* doctrine as articulated in the Court of Claims.

Although the supreme court's opinion in *Fergus v. Brady* clearly stated that it was the *legislature* which possessed the constitutional authority to make deficiency appropriations, our predecessors on the Court of Claims used the supreme court dicta concerning the Southern Illinois Penitentiary's deficiency appropriation to evolve a doctrine through which the Court of Claims either awarded or denied claims stemming from deficiency expenditures of various state agencies. All of these "pseudo-Fergus" claims, it must be emphasized, related to expenditures not addressed by deficiency appropriations from the General Assembly; rather, the "pseudo-Fergus" claimants bypassed the legislature and came directly to the Court of Claims. The Court, in turn, then compared each claim against the prison dicta in *Fergus* to reach conflicting, seemingly irreconcilable results. Examples abound, but four cases from

the Court of Claims are noteworthy for the problems caused by this doctrine of the Court's own creation:

(1) *Beane v. State* (1976), 31 Ill. Ct. Cl. 155: After the Fair Employment Practices Commission had exhausted both an original appropriation as well as a deficiency appropriation, its hearing officers and court reporters brought claims for the remaining $13,737.19 not covered by the two appropriations. Following five pages of discussion of the Court of Claims' prior applications of *Fergus*, this decision turned on a single inquiry which was summarily answered in the affirmative:

"Was the obligation under ° ° ° the Fair Employment Practices Act analogous to the situation where the prison officials had no choice but to feed, clothe, and house the prisoners assigned to their care?" We believe that they were. 33 Ill. Ct. Cl. at 161.

Awards were made.

(2) *Kankakee County Sheriff's Police Department v. State* (1979), 33 Ill. Ct. Cl. 276: These claims were for expenditures which the sheriff had made for travel to other jurisdictions to return fugitives for prosecution. As with all "pseudo-Fergus" claims, there were insufficient funds remaining in the appropriation to reimburse the sheriff. In an opinion reciting *verbatim* much of *Beane's* discussion of the *Fergus* doctrine and its progeny, the Court's analysis again was based on a summary comparison to the prison dicta:

"° ° ° This Court is of the opinion that the decision to incur the [extradition] expense for which claim is here made is discretionary and not analogous to the situation where the prison officials had no choice but to feed, clothe and house the prisoners assigned to their care. It would therefore follow that the claims should be denied." 33 Ill. Ct. Cl. 281.

(3) *Clifton F. Hall, M.D. v. State* (1979), 35 Ill. Ct. Cl. 1: This claim was initially reported at 33 Ill. Ct. Cl. 364 as an unpublished opinion but then was later published in volume 35. The doctor had rendered $314 in medical services to inmates at the Stateville prison.

The Court repeated large portions of its *Fergus* discussion from *Beane* and summarily commented that the doctor's services were "in line with the example set out by the Illinois Supreme Court in *Fergus v. Brady*." (35 Ill. Ct. Cl. 9.) However, in reaching its decision, the Court carefully avoided *Fergus* and went on to rely on the State Finance Act. The Court found that the particular appropriation at issue had not been exhausted and held that sufficient funds actually remained available to pay the doctor's claim.

(4) *Eastern Cyclone Industries, Inc. v. State* (1984), 37 Ill. Ct. Cl. 197: This claim related to laundry equipment installed at a State hospital for which, as always, insufficient funds were appropriated. The Court reiterated portions of its *Fergus* doctrine discussion as originally set forth in *Beane* but began to realize the constitutional infirmities inherent in the *Fergus* doctrine:

"° ° ° For us to make an award ° ° ° could only be described as making a deficiency appropriation and a usurpation of the legislative prerogative.

° ° ° [The *Fergus*] exception ° ° ° is extremely narrow and must be cautiously applied." 37 Ill. Ct. Cl. at 204.

However, in resolving the *Fergus* issues against the claimant, the Court chose to attempt to articulate clearer standards for the doctrine instead of invalidating it altogether:

"Authorization for virtually every expenditure of State funds can be traced to a statute or an inference to be drawn from [a] statute. The question is often one of degree. The situation here ° ° ° we do not feel, rises to the level described in *Fergus, supra*. The obligation should contain the same element of need and exigent circumstances or at the very least be a clear and unequivocal directive to pay or incur an obligation. ° ° °

We cannot make an award ° ° ° despite the obvious equities in favor of the Claimant under the facts of this case. To do so would be to condone irresponsible overspending by State agencies." 37 Ill. Ct. Cl. at 205-206.

The Court dealt a glancing blow to the *Fergus* doctrine which for a decade now has begged the constitutional question.

IV. Is the *Fergus* doctrine, as utilized by the Court of Claims, a constitutionally invalid usurpation of the General Assembly's prerogative to make deficiency appropriations?

The following colloquy between the Court and counsel for one of the other counties having a similar claim for partially-unfunded DCFS shelter care expenses frames the issue:

"Judge Poch: The legislature appropriates the money.

[Tazewell County attorney]: That's correct, Judge.

Judge Poch: And you are now asking the Court to set an amount for the legislature to pay?

[Tazewell County attorney]: That is pursuant [to *Fergus v. Brady*]

Judge Poch: They first have to legislate. They have to appropriate ° ° °.

Judge Patchett: How is it any different [from] a child [who] is a ward of the State [and receives] Public Aid, for instance? [We] have thousands of claims that come in for public aid where a child is taken to a hospital or somebody is given medical treatment, and the claim comes through here, and we order it paid out of appropriated funds or funds that have funds. But what if the Public Aid Department didn't have any money appropriated sufficient to handle that medical claim? We would have to deny the claim, I think ° ° °.

° ° °

Do you follow me? We can really run into a hundred million dollars. If the State runs out of money, and they only appropriate so much, [and] the Public Aid Department places $100 million [more] for medical care than the legislators appropriate, how would this Court order the State to pay that? It can be projected well beyond this one little problem [of your county] ° ° °.

° ° °

I don't see how we can continually tell [the General Assembly that] they have to pay money after they refuse to appropriate sufficient funds.

° ° °

[Tazewell County attorney]: I believe the legislature [put sufficient safeguards in the shelter care statute to avoid 'rampant overspending'] because they recognized that they are dealing with an area that cannot be accurately forecast as far as expenditures. They know they can't predict how many minors are going to be detained and placed [in shelter care] during any given year.

Judge Patchett: The legislature did a good job in doing all that. But the legislature consistently refuses to [properly fund] their own statute[s]. And, you know, maybe that is a political decision. They made a political decision when

they passed the statute and they make a political decision each and every time they don't appropriate sufficient money [to fund it]."

Indeed, as Judges Poch and Patchett correctly inferred, the Constitution of 1970 unilaterally gives the General Assembly the authority to make deficiency appropriations. Two portions of Article VIII, read in conjunction with section 30 of the State Finance Act, mandate such a result:

- "The General Assembly by law shall make appropriations for all expenditures of public funds by the State. ° ° °" Constitution of 1970, Article VIII, section 2(b).

- "The State ° ° ° shall ° ° ° make payments from public funds only as authorized by law ° ° °." Constitution of 1970, Article VIII, Section 1(b).

- "No officer, institution, department, board or commission shall ° ° ° assume to bind the State in an amount in excess of the money appropriated ° ° °." 30 ILCS 105/30.

Thus, the Court of Claims Act cannot confer jurisdiction to make deficiency appropriations, for that is a function which is exclusively within the legislature's domain. See also, *Illinois Education Association v. State* (1973), 28 Ill. Ct. Cl. 379, 386.

Interestingly, in Mr. Fergus' arguments to the Illinois Supreme Court back in 1916, he warned of the fiscal evils which could result from a failure to properly construe the Constitution:

"[Opposing] Counsel in their brief have laid much stress upon an inevitable calamity which would befall the State if the prison officials were not allowed to go in debt for supplies. [T]hey draw a terrible picture of murderers, robbers, and thieves who are turned loose to prey upon the public. This is the old argument so often made—the hard case which would make bad law. The court is asked to legislate to change the Constitution to meet a contingency."

In *Chicago v. McDonald,* 176 Ill. [404,] 409, [52 N.E. 982, 983 (1898)] the court said:

"The question has frequently arisen whether a municipal corporation can incur an indebtedness in excess of 5 percent of its taxable property for necessary supplies, such as light and water."

The argument there presented was that the city could not exist without light and water, but the court said:

"To so construe the Constitution would be to add a provision in the nature of an exception to the Constitution, which the framers of that instrument did not see proper to insert."

We note that little is said in the argument concerning the appropriations to the [thirteen] other departments of the state government. Counsel do not find a great calamity if the insurance superintendent, or other officers, are not allowed to incur debts. We do not believe it is possible to draw a distinction between one class of over-buying and another class. Under the Constitution, they are all right or all wrong. If they are all right, then every public official has a legal right to secure as much credit as he desires, and the legislature has full power to make [deficiency] appropriations for any of these debts, and the State of Illinois will never at any time know the nature or extent of its outstanding obligations.

Similarly phrased in terms of the *Fergus* doctrine which has evolved in the Court of Claims, one would logically conclude that, if the doctrine were constitutionally sound, no proper distinction could be drawn between one class of deficiency expenditure and another class. In other words, if it could have been permissible under *Fergus* for the Court of Claims to award a deficiency appropriation to a penitentiary for such sundry items as lawn mower repairs, postage stamps, a florist, and a gardener (see pages 7-8 above), how then could this Court possibly deny reimbursement of a county sheriff's expenses in returning fugitives for prosecution or deny a State hospital's laundry equipment expenses? Or, to use the better hypothetical posed by Judge Patchett, how could this Court differentiate the $100 million medical expense deficiency from McLean County's $96,914.96 shelter care expenses? The obvious answer is that if any one such deficiency expenditure were

proper, all would have to be proper, and no restraint could be imposed by this Court on a department or agency's disregard of its budgeted appropriation.

The law, thankfully, is otherwise. The Constitution gives the General Assembly—not the agencies, not the departments, and not even the Court of Claims—the exclusive authority to exercise its discretion in determining whether to make deficiency appropriations and, if so, in what amounts. True, those who deal with State offices which exceed appropriated expenditures may find themselves becoming involuntary, unpaid creditors of those agencies. But that is what the Constitution allows. That is the very protection which the Constitution provides to control against overspending, and it is not for this Court to re-draft the Constitution.

V. Conclusion.

The Court of Claims' *Fergus* doctrine is a constitutionally infirm principle which had its origin in nothing more than dicta taken out of proper context. As such, the *Fergus* doctrine never should have been adopted, and it is hereby abolished. This Court's practice of referring deficiency appropriation claims to the General Assembly is the only constitutionally-proper procedure.

Accordingly, the Court finds that it does not have subject matter jurisdiction to award any sums beyond the $13,670.69 in pro-rations[5] previously made to these nine counties. It is ordered that the motion to reconsider is denied. Should these nine counties choose to approach the General Assembly for a deficiency appropriation, we find

---

[5] It should be noted that these pro-rations were made prior to this Court's adoption of the first-in/first-out ("FIFO") policy set forth in *Aurora College v. State* (1985), 37 Ill. Ct. Cl. 321, 323 and that lapsed balances are no longer pro-rated among all claimants. In denying the instant motion to reconsider, the Court is not in any manner reversing its policy as articulated in *Aurora College*.

the net dollar amount of their deficiency to be $427,438.99 ($441,109.68 DCFS' aggregate audited total less the $13,670.69 awarded by this Court's previous order).